UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA

    - against -

JAMES L. SCHMIDT,

          Defendant.
----------------------------------------------------------X

**MEMORANDUM & ORDER**
14-CR-506 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Before the court is the government's fully-briefed motion *in limine* to admit evidence at trial, described more fully below, of a prior money laundering scheme (the "Speight Scheme") involving the sale of fake stock certificates to innocent investors involving defendant James Schmidt and Cecil Franklin Speight. In that scheme, Schmidt used his attorney escrow account to accept investor funds and funnel it back to the stock promoters minus a fee, ultimately admitting to law enforcement that he knew the stocks were fraudulent but, nonetheless, facilitated the Speight Scheme. The money laundering scheme charged in the instant case (the "UC Scheme") was modeled on the Speight Scheme, came about through Speight's introduction of Schmidt to an undercover FBI agent posing as an individual who would also be selling fake stock certificates provided by Speight, and involved Schmidt playing the same role and using the same escrow account as he did in the previous scheme, albeit negotiating a greater fee for his efforts.

      The government argues that the evidence of the Speight Scheme is admissible as direct evidence, and in any event, pursuant to Federal Rule of Evidence 404(b). For the reasons set forth below, the Court agrees and the government's motion is granted.

**The Government's Proffer**

As the government has proffered, it seeks to introduce limited evidence related to the Speight Scheme from two sources – Schmidt's own admissions, and recorded conversations made in connection with the UC Scheme between Schmidt, the UC and Speight, in most instances involving all three men, but in some cases, involving only Schmidt and Speight and/or Schmidt and the undercover. The government has proffered that evidence as follows.

First, the government seeks to introduce statements that Schmidt made to law enforcement that demonstrate that Schmidt aided Speight in selling securities and knew that at least some of those securities were counterfeit. Specifically, Schmidt acknowledged that he knowingly and intentionally received money from Speight's victim-investors into his attorney escrow account, took a 2% fee on the money, and then transferred the balance of the funds back to Speight. Schmidt also admitted that he knew the certificates Speight was selling were counterfeit, but nevertheless continued to facilitate Speight's scheme. For example, when he was first approached by FBI agents in April 2014, the defendant stated, in sum and substance, that he knew at least one year earlier that Speight was dealing in counterfeit stock certificates, that he was surprised any investors could believe the certificates were real, and that he continued to help with transactions involving those certificates out of "naivete, willful blindness, and stupidity." All of the statements described in this paragraph were made during the investigation of the UC Scheme.

The government also seeks to present evidence that Speight introduced Schmidt to the undercover and that the undercover and Speight told Schmidt that Schmidt's role in the UC Scheme would be similar to his role in the Speight Scheme. Again, this evidence will consist of statements the defendant made to, or in the presence of, law enforcement during the investigation

of the UC Scheme. For example, during one such conversation, Speight said that the defendant's responsibilities in the UC Scheme would be "just like last time," and the defendant agreed.

Finally, the government seeks to introduce evidence that Schmidt believed that the securities involved in the UC Scheme were to be provided by Speight, just as Speight had provided securities (believed by Schmidt to be counterfeit as he acknowledged to law enforcement) for the Speight Scheme. This evidence will consist of the defendant's conversations with the undercover and Speight after the Speight Scheme had ended. For example, in February 2014, the undercover stated to Schmidt that the certificates he was selling would "come through Frank [Speight]."

**Admissibility of the Evidence**

The government first argues that this evidence should be directly admissible without regard to Rule 404(b) because the relationship between Schmidt and Speight and their two schemes are inextricably intertwined, and proof of the Speight Scheme provides important background as to how the UC met Schmidt and how the UC scheme began. As the government correctly notes,

> evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.

*United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). Arguably, the government's evidence falls under this standard. However, "where it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)." *United States v. Nektalov*, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004). Here, the Speight Scheme began in May 2012 and terminated in or about the spring/summer of 2013, after

3

the Securities and Exchange Commission intervened in response to investor complaints. It was not until mid-September, 2013 that Speight, in an attempt to cooperate with the FBI, introduced Schmidt to "Max" the undercover, and the charged scheme began. This temporal break, caused by two significant intervening events, colors the relationship between the two schemes for purposes of this analysis. As one court has observed, "close timing between intrinsic evidence and the charged conduct has featured significantly in the Second Circuit's decisions applying the standard set out in *Carboni*." *United States v. Dolney*, 04-CR-159, 2005 U.S. Dist. LEXIS 45750 at *5 (E.D.N.Y. September 1, 2005) (declining to find sufficient direct nexus where two-year gap between proffered events and crimes charges, instead admitting evidence under Rule 404(b)); *see also United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) (finding proper admission as direct evidence of attempted burglary that took place immediately before defendants found in possession of firearms, concluding that evidence of the burglary "provide[d] crucial background evidence that gave coherence to the basic sequence of events that occurred on [that] night").

But the court need not belabor this point as the evidence of the Speight Scheme falls squarely within the bounds of Rule 404(b). Courts in the Second Circuit take an "inclusionary approach" to Rule 404(b), admitting evidence of prior crimes, wrongs or acts "unless it is introduced for the sole purpose of showing the defendant's bad character, or unless it is overly prejudicial under Fed.R.Evid. 403 or not relevant under Fed.R.Evid. 402." *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996); *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003). Under this approach, such evidence must be (1) offered for a proper purpose, (2) relevant, and (3) substantially more probative than prejudicial. *United States v. Moran-Tala*, 726 F.3d 334, 345 (2d Cir. 2013). If admitted, the district court should provide the jury with an

4

appropriate limiting instruction concerning the evidence if the defendant so requests. *United States v. Downing*, 297 F.3d 52, 58 (2d Cir. 2002).

Here, the evidence of the Speight Scheme is being offered for proper purposes and is relevant and probative. As the government described in arguing for its admissibility as direct evidence, the Speight Scheme provides relevant and probative background information as to how Schmidt met the undercover and how the charged scheme began. "One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case … [and] may also be used to help the jury understand the basis for the co-conspirator's relationship of mutual trust." *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996). While Speight is technically not considered a co-conspirator because of the nature of the UC scheme, that fact does not undercut the probative value of the evidence here. The evidence of the Speight Scheme explains how Schmidt came to know and trust the undercover, and how the UC Scheme would be formed and would function. "The Second Circuit has afforded significant leeway regarding such evidence in conspiracy cases." *Nektalov*, 325 F. Supp. at 371 (collecting cases). Indeed, the UC Scheme was modeled on the structure of and methods used in the successful and lucrative Speight Scheme, with Schmidt playing the identical role. Evidence of that prior scheme is highly probative of Schmidt's willingness to embark on the criminal scheme – the UC Scheme – that led to the instant indictment, and provides critical context for the references in the recorded conversations with the undercover in which Schmidt is advised that the UC Scheme would be conducted in the same manner as the Speight Scheme.

Moreover, "where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind

5

necessary to commit the offense charged." *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) (evidence that defendant had previously engaged in narcotics trafficking with a co-conspirator is highly probative of the defendant's intent to enter another drug conspiracy with the same co-conspirator, and to rebut the defendant's defense of innocent association). Here, Schmidt has suggested that he did not have any knowledge of the criminal nature of either the Speight Scheme or the charged crime; thus, knowledge will be a central issue in this trial. (Resp. in Opp. re First Mot. in Lim. to Admit Uncharged Acts (Doc. No. 29) at 1.) Here, evidence of Schmidt's role in the Speight Scheme and his admission that he knew that the securities there were fake and were furnished by Speight is evidence probative of Schmidt's knowing participation in the charged scheme, a scheme in which Schmidt played the identical role with securities of the same type furnished by the same individual. As the government put it, "evidence of the defendant's role in the Speight Scheme directly refutes the defendant's claim that he was an unwitting pawn [in] the [u]ndercover scheme, or that he lacked the criminal intent necessary to commit the charged offense." (Gov't Mot. in Lim. to Admit Uncharged Acts (Doc. No. 26) at 5.)

Thus, the proffered evidence is relevant and probative and to be used for proper reasons as required by Rule 404(b). It is not being offered to show propensity as Schmidt argues. Rather,

> the government will ask the jury to draw the reasonable inference that, because the defendant "was knowingly involved in the Speight scheme" and because the UC and Speight said that the UC Scheme would be the same or similar to the Speight Scheme and because the defendant was told Speight again would provide the securities being sold, the defendant therefore knew or was willfully blind to the fact that the UC Scheme would involve criminal conduct.

(Gov't Reply (Doc. No. 32) at 3.) As discussed, this is a permissible inference under Rule 404(b) because the evidence of the Speight Scheme goes to Schmidt's knowledge of the fraud in the UC Scheme.

6

The court also concludes that the probative value of the evidence is not outweighed by the danger of unfair prejudice. The evidence of the Speight Scheme is no "more sensational or disturbing than the crime[] with which [the defendant] was charged." *United States v. Roldan–Zapata,* 916 F.2d 795, 804 (2d Cir. 1990). Moreover, the government has carefully tailored its evidence to ensure that the focus of the trial will be on the conspiracy with which Schmidt is charged. Indeed, as the government proffers, "[t]he evidence of the Speight Scheme . . . almost entirely arises out of conversations that the government will in any event present to the jury because those conversations relate to the UC Scheme." (Gov't Reply at 3.) And as the government correctly adds, "because Speight participated in two key meetings with the defendant and the UC, there is a real risk that the jury might be confused if the government were <u>prevented</u> from explaining the relationship between the defendant and Speight." (*Id.* (emphasis in original).) Of course, any prejudice can be mitigated by a limiting instruction to the jury concerning the proper purpose for which they may use this evidence in their deliberations should Schmidt make such a request. *United States v. Abu-Jihaad*, 630 F.3d 102, 133 (2d Cir. 2010); *United States v. Kalish*, 403 Fed. App'x 541, 547 (2d Cir. 2010).[1]

Thus, for these reasons, the government's proffered evidence of the Speight Scheme is admissible pursuant to Federal Rule of Evidence 404(b).

There is, however, an additional objection to this evidence that requires further discussion. The government seeks to admit this evidence without calling Cecil Speight to testify. Schmidt lodges a number of objections (Def. Opp. at 5; Def. Sur-Reply (Doc. No. 35)); the court finds them without merit. The government seeks to admit much of this evidence through statements made by the defendant himself, as well as documents created by or related to actions taken by the defendant. Speight's testimony is not necessary to establish or explain this evidence. Nor would any statements

---

[1] In addition, the benefit of such an instruction further supports treating the proffered evidence under Rule 404(b) rather than as direct, intrinsic evidence of the UC Scheme. *See Dolney*, 2005 US Dist. LEXIS 45750 at *5-6.

by Speight in the recorded conversations to be played for the jury run afoul of the prohibitions against hearsay, or the Due Process or Confrontation Clauses, as Schmidt suggests. As the government proffers in its motion, and as it stressed at the pre-trial conference held on February 12, 2016, Speight's statements are not being offered for the truth of the matters asserted with regard to the Speight Scheme – that is, they are not being offered to prove the truth of the criminal nature of the Speight Scheme or the fact that Schmidt knew of the corrupt nature of that scheme; as the government represents, the truth of those matters will be established through Speight's own admissions. Rather, Speight's statements about his prior scheme with Schmidt are being offered "to help establish what the defendant believed about the UC Scheme, the relevant issue [underlying the crime charged]." (Gov't Reply at 3 (emphasis added).) Under these circumstances, Schmidt has no right to confront Speight, nor is there anything unfair, improper, or unconstitutional about presenting the evidence in this manner.

Finally, at the February 12 pre-trial conference, and in opposition to the motion, Schmidt suggested that introduction of the Speight Scheme evidence will prompt the jury to draw an improper inference that Speight must have told the FBI that Schmidt *knew* of the criminal nature of their prior scheme, merely because Speight spoke to the FBI and the FBI then began investigating Schmidt. First, from the evidence the government seeks to introduce, it is difficult to see how any reasonable juror could infer that Speight made statements to the FBI specifically about Schmidt's knowledge, or conclude that the mere fact that the FBI started an investigation after speaking to Speight means that Schmidt *knew* that the Speight Scheme was criminal in nature. And in any event, the government has further proffered that the FBI investigation of Schmidt began *before* Speight spoke to the FBI, as a result of an analysis of Schmidt's bank records. The government has offered to introduce that evidence, and defense counsel appeared eager to accept that offer or to raise that evidence on cross-examination himself in order to

8

obviate the very concerns he had raised. In any case, the court finds that these concerns lack merit, and do not outweigh the reasons for admitting the Speight Scheme evidence under Rule 404(b).

## CONCLUSION

For the reasons stated herein, the government's motion *in limine* to admit evidence of the Speight Scheme (Doc. Nos. 23, 26, 29, 32, 35) is granted.

SO ORDERED.

Dated: Brooklyn, New York
       February 18, 2016

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge